2024 IL App (1st) 230196-U
No. 1-23-0196

FIRST DIVISION
December 9, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| MARYANNE BAJGROWICZ, as Independent Executor of the Estate of Sylvia Shearin, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2017 L 7501 |
| DEV MEDICAL ASSOCIATES, S.C. and NICOLAOS ABARIOTIS, M.D., | ) ) ) | |
| Defendants-Appellants. | ) ) ) ) | Honorable Maura Slattery Boyle, Judge presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Following a jury verdict in favor of the plaintiff, defendants were not entitled to judgment notwithstanding the verdict (JNOV). The trial court did not abuse its discretion in barring any evidence of plaintiff's background as a nurse, and we reject defendants' other claims of errors at trial. Defendants were not entitled to a remittitur or to reduction of the medical damages award under section 2-1205 of the Code of Civil Procedure. (735 ILCS 5/2-1205 (West 2022)). We also reject defendants' attacks on application of the prejudgment interest statute. 735 ILCS 5/2-1303(c) (West 2022). We thus affirm the judgment on the plaintiff's verdict.

¶ 2 This is a medical negligence case brought by Maryanne Bajgrowicz (plaintiff), as independent executor of the estate of her late mother, Sylvia Shearin (Sylvia). As discussed further below, the case largely focuses on the circumstances by which defendant Nicolaos Abariotis, M.D. prescribed a medication, warfarin, that was administered by plaintiff (a licensed nurse) to her mother, Sylvia. It is undisputed that Sylvia was hospitalized for a warfarin overdose in November 2016, after ingesting 3-milligram warfarin pills that were prescribed by Dr. Abariotis and given to Sylvia by plaintiff.

¶ 3 The jury returned a verdict in favor of plaintiff in the amount of $1,365,000, including an award of $465,000 for Sylvia's medical expenses. The trial court entered judgment on the verdict, adding prejudgment interest in the amount of $56,544.66. Defendants' post-trial motion was denied.

¶ 4 On appeal, defendants assert they were entitled to judgment notwithstanding the verdict (JNOV) because plaintiff's expert testimony was insufficient to prove plaintiff's case. They otherwise urge they are entitled to a new trial because the trial court's rulings unfairly barred the jury from hearing any evidence referencing plaintiff's nursing background. Defendants separately assert errors related to the content of plaintiff's closing argument, plaintiff's expert testimony, and the trial court's instructions to the jury on damages. In the alternative to a new trial, defendants seek remittitur of the verdict or a reduction of the award of medical expenses pursuant to section 2-1205 of the Code of Civil Procedure. 735 ILCS 5/2-1205 (West 2022). Finally, defendants seek vacatur of the prejudgment interest award by challenging the constitutionality of the authorizing statute, section 2-1303(c) of the Code of Civil Procedure. 735 ILCS 5/2-1303(c) (West 2022).

¶ 5 For the following reasons, we reject all of defendants' arguments and affirm the judgment entered on the jury's verdict.

¶ 6     BACKGROUND

¶ 7     Sylvia was born in 1918 and had a number of children, including plaintiff. At relevant times, Sylvia was a patient of Dr. Abariotis, a cardiologist who practiced with defendant DEV Medical Associates, S.C. (collectively, defendants). At the time of the 2016 warfarin overdose that is the basis for this action, Sylvia was 98 years old.

¶ 8     Plaintiff, who has a nursing degree, managed and administered her mother's prescriptions. Among other daily medications, Sylvia took warfarin, an anticoagulant, for several years.

¶ 9     For several years leading up to October 2016, Dr. Abariotis regularly authorized prescriptions for Sylvia consisting of 1-milligram tablets of warfarin. Subject to some variation, he usually directed that Sylvia take 1 milligram six days per week and take 1.5 milligrams one day each week. Plaintiff regularly ordered refills of her mother's prescriptions and picked them up from a Walgreens pharmacy in Park Ridge, Illinois.

¶ 10    In October 2016, Dr. Abariotis authorized a prescription for 90 3-milligram tablets of warfarin, which was picked up from Walgreens in early November 2016. The label on that pill bottle indicated that it contained "WARFARIN SOD [sodium] 3MG TABLETS" and said "TAKE 1 TABLET BY MOUTH AS DIRECTED." The record contains the following photograph of the pill bottle for the prescription at issue:



¶ 11    The parties dispute how this specific prescription originated, *i.e*., whether plaintiff asked Dr. Abariotis to prescribe 3-milligram pills, or whether it was a mistake by Dr. Abariotis or someone in his office.

¶ 12    On November 29, 2016, Sylvia was admitted to Resurrection Medical Center due to a warfarin overdose. She was discharged on December 23, 2016.

¶ 13    Sylvia was subsequently hospitalized in January 2017 and March 2017, although the parties dispute whether those hospitalizations were related to the 2016 warfarin overdose. While this action was pending, Sylvia died in April 2019, at the age of 100.

¶ 14    In July 2017, this lawsuit was commenced when Sylvia filed a complaint against defendants, as well as Walgreens Boots Alliance, Inc. (Walgreens). The first amended complaint, filed in August 2017, alleged that Walgreens personnel were negligent in filling the October 2016 prescription for 3-milligram tablets because, *inter alia*, they "filled the prescription for Warfarin 1MG with the wrong medication." That pleading also alleged that Walgreens was negligent in responding to a telephone inquiry by one of Sylvia's daughters "as to why the tablets in the aforementioned prescription were a different color and larger in size."

¶ 15    In 2021, Walgreens was voluntarily dismissed from the case pursuant to a settlement.

¶ 16    After Sylvia passed away, her daughter Maryanne Bajgrowicz was substituted as plaintiff herein, in her capacity as independent executor of Sylvia's estate. Plaintiff's seventh amended complaint, filed in March 2022, included four counts for medical negligence and "*res ipsa loquitor*." Plaintiff alleged that defendants negligently increased Sylvia's warfarin dosage to 3 milligram per day, and that they negligently failed to communicate the dosing change and corresponding instructions to plaintiff.

¶ 17    Plaintiff alleged that Sylvia ingested three milligrams of warfarin per day from approximately November 5 through November 29, 2016, leading to hospitalization for warfarin overdose. Plaintiff alleged that the overdose resulted in anticoagulation that caused "severe bleeding, respiratory distress, dysphagia, acalculous cholecystitis," deterioration in her physical and cognitive condition, pain and suffering, and mental anguish.

¶ 18                              <u>Deposition Testimony</u>

¶ 19 The parties conducted numerous depositions of fact and expert witnesses. At her deposition in January 2019, plaintiff acknowledged that she was a practicing nurse for many years after earning a bachelor's degree in nursing . From 1988 to 2006, she worked at Resurrection Medical Center (Resurrection), first as a nurse and then as a nurse "manager." As a nurse, she cared for patients in the "recovery room" following surgery. Plaintiff came to know Dr. Abariotis through her employment at Resurrection. Plaintiff subsequently worked at Our Lady of the Resurrection Hospital from 2006 to 2013 or 2014. Plaintiff testified that she maintained an active nursing license. At the time of her deposition, she was employed by Advocate Condell Medical Center as a "director for nursing," although she did not treat patients in that role.

¶ 20 Elsewhere in her deposition, plaintiff testified that she was the person who picked up her mother's prescriptions and placed warfarin pills in her mother's pill box. Plaintiff testified that she picked up the prescription that was ordered on October 28, 2016. She testified that she called the pharmacy and asked why the color of the tablets was different. She recalled that she was told that "generics sometime change colors." Plaintiff acknowledged that the 3-milligam pill was marked with a "3" but testified she did not notice this at the time. She did not realize that she was giving her mother 3-milligram pills.

¶ 21 In his deposition, Dr. Abariotis testified that he knew plaintiff was a nurse. He believed she would be able to follow his dosing instructions, and that she would be able to distinguish between a 1-milligram pill and a 3-milligram pill. However, he did not have any specific recollection of discussing the October 2016 warfarin prescription with plaintiff.

¶ 22 Motion *in Limine* to Bar Plaintiff's Nursing Background

¶ 23 Before trial, plaintiff filed a motion *in limine* to bar introduction of any argument or testimony referring to her background as a nurse, or any suggestion that she managed her mother's

warfarin dosing "in her professional nursing capacity." Plaintiff argued that any reference to her nursing background was more prejudicial than probative and raised a high likelihood of confusing and misleading the trier of fact. The trial court granted plaintiff's motion, agreeing that reference to plaintiff's nursing background could be prejudicial.

¶ 24 The case proceeded to a jury trial in 2022. Plaintiff elicited testimony from two expert witnesses, Dr. Neal Shadoff and Dr. Kenneth Nelson.

¶ 25 Dr. Neal Shadoff

¶ 26 Plaintiff called Dr. Neal Shadoff as an expert witness in cardiology. He had reviewed Sylvia's medical records, as well as depositions in this case. He stated he sought to "figure out how it was that after quite a few years on the same dose of warfarin there was a change in the dosing tablet size." He also tried to figure out how the warfarin overdose "related to the need for the hospitalizations that occurred."

¶ 27 Dr. Shadoff testified that, based on his review of the medical records, Dr. Abariotis began providing care for Sylvia in 2004 and he remained her physician until May 2017. In 2009, Sylvia was diagnosed with atrial fibrillation and placed on warfarin. Dr. Shadoff described atrial fibrillation as a "disorder of the heart rhythm where instead of the atrium rhythmically pumping ***, it starts to quiver like you would see Jell-O quivering." He explained that a major risk of atrial fibrillation is a blood clot formation, which can cause a stroke. Warfarin is prescribed to prevent clot formation.

¶ 28 According to Dr. Shadoff, records reflected that from 2009 to October 2016, Dr. Abariotis typically prescribed Sylvia 1 milligram of warfarin per day. "Sometimes there would be 1 and a half milligrams some number of days per week, but it probably averaged 1 milligram a day." Dr. Shadoff opined that this dosage was appropriate.

¶ 29    Dr. Shadoff believed that in October 2016, Dr. Abariotis "mistakenly prescribed 3-milligram warfarin tablets" instead of 1-milligram tablets. Sylvia's ingestion of the larger pills resulted in excessive anticoagulation, that is, "thinning of the blood that resulted in a spontaneous catastrophic bleed in [her] neck." This caused difficulty breathing, and she was put on a respirator for several days. She also experienced difficulty swallowing and anemia from losing blood. Dr. Shadoff testified this was "followed by a debilitated state that took away her ability to handle usual illnesses," leading to her January 2017 bout with pneumonia and "several months later a problem with a decompensation of her congestive heart failure which had been extremely well controlled for many years."

¶ 30    Dr. Shadoff testified that the mistake in prescribing a 3-milligram tablet was a violation of the standard of care, as there was "no logical reason to all of a sudden after so many years change to three times the tablet dosage of warfarin."

¶ 31    Dr. Shadoff testified that the standard of care with respect to warfarin is to "prescribe the right dose and do follow-up testing" to maintain the proper dose. He explained that warfarin tablets come in "1, 2, 3, 5, 7.5 and 10-milligram tablets sizes to allow [physicians] to adjust" the appropriate dose. He described how the "therapeutic amount" of warfarin is determined through a blood test known as the "PT/INR test." "PT" refers to "prothrombin time" and "INR" refers to "international normalized ratio."[1] According to Dr. Shadoff, "the number that we aim for in preventing blood clots from atrial fibrillation is between 2 and 3." That is, the appropriate dose is one that keeps the INR "ratio between 2 and 3."

---

[1] "The INR is found using the result of the prothrombin time (PT) test. This measures the time it takes for your blood to clot. The INR is an international standard for the PT." https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=international_normalized_ratio (last visited October 31, 2024).

¶ 32      Dr. Shadoff opined that if a cardiologist changes the warfarin dose, the standard of care requires him to "let the patient and/or family know" about the change and to communicate with them "as to how to take a new dosage tablet size."

¶ 33      Dr. Shadoff testified that before October 2016, Dr. Abariotis had not prescribed any tablet other than a 1 milligram tablet. A Walgreens pharmacy record showed that on October 28, 2016, a prescription was ordered for 90 3-milligram tablets; the prescription was picked up on November 5, 2016. Dr. Shadoff opined that there was nothing in Sylvia's medical history that warranted changing from a 1-milligram tablet at that point. He opined that Sylvia and her family were "used to" the 1-milligram tablet and "now to prescribe 3-milligram tablets, potentially at least three times the dose could be catastrophic." Dr. Shadoff testified that it was apparent that Sylvia took 20 of the 3-milligram tablets, because there were 70 tablets remaining in the prescription bottle.

¶ 34      Dr. Shadoff also testified that, assuming Sylvia's dosing schedule remained the same, the 90-quantity prescription of 3-milligram pills would last "45 months," or more than three and a half years.[2] Plaintiff's counsel asked Dr. Shadoff if he had ever "prescribed three years of medication of warfarin" for one of his patients. He responded: "No. You're not allowed to. The most you can prescribe, according to the DEA, is one year without reevaluating the patient." Over defense counsel's objection, the court allowed the answer to stand.

¶ 35      During a recess, but before Dr. Shadoff's testimony concluded, the court heard argument outside the presence of the jury regarding the defense objection to his testimony referencing the

---

[2] It is not entirely clear from his testimony how Dr. Shadoff arrived at this figure. Perhaps he meant that, assuming Sylvia continued to take a 1-milligram pill for six days a week and take half of one  3-milligram pill on the seventh day each week (*i.e.*, 1.5 milligrams on the seventh day), the 90 3-milligram pills would be enough for 180 weeks, or approximately 45 months. In any event, it is not our role to assess whether the math was correct.

DEA. Defense counsel urged that this opinion had not been disclosed and requested that the court instruct the jury to disregard it.

¶ 36    The court indicated it could give a curative instruction, and defense counsel suggested that it tell the jury to disregard the testimony that referred to a DEA regulation. Plaintiff's counsel did not object. When the jury returned, the court addressed them: "[E]arlier today, you heard a question and answer in regard to DEA regulations. That should be stricken and disregarded in this case, and you are not to use that in your consideration of the evidence going forward."

¶ 37    When Dr. Shadoff's direct examination resumed, he testified that there was nothing in the medical records to explain why the warfarin dosage was increased from 1 milligram to 3 milligrams in October 2016. He noted that Sylvia had been on the "same or similar dose" for many years and there was "no logical reason" to increase the dose at that time.

¶ 38    Dr. Shadoff opined that Dr. Abariotis violated the standard of care by ordering 3-milligram tablets in October 2016. He also opined that defendants violated the standard of care by failing to communicate the change and provide appropriate dosing instructions, as "it would be confusing to a patient and/or their family to all of a sudden have to deal with different-size tablets."

¶ 39    Dr. Shadoff testified that the deviations from the standard of care resulted in "excessive anticoagulation that put the [INR] blood test at some number greater than 20," when the ideal range was between 2 and 3. He explained this led to bleeding in the "back of the throat that resulted in compression of both the esophagus and the pharynx, *** so that swallowing became problematic. And it squeezed on the trachea, the windpipe, so that breathing was problematic." He stated that Sylvia's medical records showed a possible neck hematoma, meaning a "bruise and the collection of blood in the neck." This led to difficulty swallowing and vocal changes.

¶ 40    As a result of the overdose, Sylvia required a tube to be placed into her windpipe so it did not collapse. She remained on a ventilator for about six days. Dr. Shadoff opined that the hospitalization "put extra stress on her heart" and exacerbated her congestive heart failure.

¶ 41    Sylvia was discharged from a rehabilitation center in December 2016. The next month, January 2017, she developed pneumonia that required hospitalization and resulted in "a further decline in her breathing status." Dr. Shadoff testified that a virus that would "normally just cause a cold or maybe some bronchitis" may cause pneumonia in someone who is "debilitated." Dr. Shadoff opined that the warfarin overdose worsened Sylvia's cardiac condition and "created this debilitative state."

¶ 42    Dr. Shadoff opined that, if Sylvia had not previously been hospitalized for the warfarin overdose, the virus in January 2017 "would have caused a cold or maybe some bronchitis but not this kind of inflammatory response and pneumonia." He testified that this bout of pneumonia "worsened her debilitated state" and put more pressure on her heart. Dr. Shadoff acknowledged she had congestive heart failure for several years, but he noted she was not hospitalized for it before the warfarin overdose.

¶ 43    In March 2017, Sylvia was again hospitalized due to "exacerbation or decompensation of her congestive heart failure." Records showed that she was admitted with dyspnea, or shortness of breath.

¶ 44    On cross-examination, Dr. Shadoff agreed that Sylvia had been diagnosed with dementia a number of years earlier. He agreed that in 2016, the prescribed dosage of warfarin was "generally 1 milligram, six days a week, 1.5 milligrams on the seventh day." He agreed this was an appropriate dosing regimen.

¶ 45    Dr. Shadoff agreed that congestive heart failure can progress with age, and that Sylvia was 99 years old after the March 2017 hospital admission. He agreed that records from a May 2017 visit with Dr. Abariotis indicated that she did not report shortness of breath. He agreed that an August 2017 record of a visit with another doctor, Dr. Vohra, indicated Sylvia was "still doing relatively well."

¶ 46    Dr. Shadoff acknowlegdged that a record of a December 7, 2017 visit to Dr. Vohra indicated a decompensation of Sylvia's congestive heart failure. At that time, she complained of worsening shortness of breath. She had also gained about six pounds, which was "consistent with fluid or volume overload."

¶ 47    On redirect examination, Dr. Shadoff testified that to meet the standard of care, "you have to document" communications between doctor and the patient's family. There was no indication in the medical record that Sylvia's family requested the October 2016 refill that contained 3-milligram warfarin tablets.

¶ 48    Dr. Shadoff testified that the dosing instructions on the bottle containing the 3-milligram pills said: "Take 1 tablet by mouth as directed." On re-cross examination, Dr. Shadoff acknowledged that this language came from the pharmacy, whereas Dr. Abariotis's records specified dosages in terms of milligrams. That is, the doctor's records stated "1 milligram times whatever number of days, 1.5 milligram times whatever number of days," rather than referring to the number of tablets. Dr. Shadoff also acknowledged that the bottle label stated it contained 3-milligram tablets. However, Dr. Shadoff testified that in his experience, "nonphysicians think of it in tablets and not in milligrams."

¶ 49    The Court Again Precludes Reference to Plaintiff's Nursing Background

¶ 50    Following Dr. Shadoff's testimony and outside the presence of the jury, defense counsel argued it was entitled to inform the jury that plaintiff was a nurse. Defendants argued that Dr. Shadoff's testimony opened the door to this topic, when he testified that patients think of medication dosages in terms of tablets and not milligrams. Defense counsel also argued plaintiff's counsel had referred to plaintiff as a layperson. The defense urged that Dr. Abariotis should be able to tell the jury that he trusted plaintiff "because he knew she was a nurse."

¶ 51    In opposition, plaintiff's counsel stated its position that the dosing instructions were "confusing for anyone, regardless of whether you're a nurse or not." Plaintiff's counsel also argued that it was inappropriate to identify plaintiff as a nurse because defendants did not disclose a nursing expert "to testify to the standard of care of a nurse." Plaintiff argued that disclosing plaintiff's nursing background would be prejudicial, as it would lead the jury to hold her to a professional standard of care.

¶ 52    The trial court denied defense counsel's request, remarking that "the duty is as a daughter not as a nurse practitioner or this patient." The court also noted there was no witness who could testify whether plaintiff acted in accordance with the standard of care of a nurse.

¶ 53                              Plaintiff's Trial Testimony

¶ 54    Plaintiff testified that her mother, Sylvia, was born in 1918 and remained active into her 90s. In approximately 2007, her family noticed she had some short-term memory problems, and subsequent testing showed "mild cognitive impairment or early dementia." Over the next several years, Sylvia "needed reminders about things" but was otherwise in good health. Sylvia was diagnosed with atrial fibrillation in 2009, but she was not hospitalized from that time until November 2016.

¶ 55    In the period from 2010 to 2016, plaintiff managed Sylvia's daily medications, including warfarin. She picked up her mother's prescriptions and put the pills into a pillbox that had separate spaces labeled for each day of the week. When one of her mother's prescriptions was running low, she would call the Walgreens pharmacy and use an automated system to order refills. Plaintiff did not contact Dr. Abariotis's office directly to request refills.

¶ 56    Plaintiff testified her mother had regular blood tests, after which Dr. Abariotis or his office would communicate warfarin dosing instructions to her, either by phone or voicemail. Plaintiff testified that the usual instruction was to "take 1 milligram six days, take 1 and a half [milligrams] another day." She recalled the dosing schedule sometimes had "minor little tweaks" but did not change much in the years leading up to November 2016. She testified that her mother's prescriptions always contained 1-milligram tablets, which plaintiff would place into the pillbox on a weekly basis. Plaintiff typically picked up warfarin refills in a 90-day quantity.

¶ 57    Plaintiff denied that she ever asked Dr. Abariotis or his staff to prescribe 3-milligram tablets, or that she was ever told that the size of the warfarin tablets was being changed to 3 milligrams. Plainttiff testified that before her mother's hospitalization on November 29, 2016, she did not know that Dr. Abariotis had prescribed 3-milligram tablets.

¶ 58    Plaintiff acknowledged that she picked up a bottle of warfarin tablets in November 2016. Plaintiff testified that when she opened that bottle, "the tablets were a little different color" from prior prescriptions, so she called the pharmacy about it. According to plaintiff, the pills were "the same shape and size, but just the color was different." The person she spoke with at the pharmacy told plaintiff that "if it's a generic, they sometimes have [a] different manufacturer so it might look a little bit different." Plaintiff recalled she was satisfied with the pharmacy's explanation. She maintained she did not know the prescription contained 3-milligram tablets until after her mother

was hospitalized, when plaintiff's sister, Virginia, "told me that when she was putting them back in the bottle, she looked at it and saw it was a 3-milligram."

¶ 59    Plaintiff testified that Sylvia was brought to the emergency room because she was having trouble breathing and had bruising on her neck and chest. She underwent intubation surgery to help her breathing. Her mother was sedated and in the ICU for six to ten days.

¶ 60    According to plaintiff, she and her sister told Dr. Abariotis in the hospital that they discovered that their mother was taking 3-milligram tablets. Dr. Abariotis was "surprised." He left and came back a short time later and said: "It wasn't us." He told them that the pharmacy made an error.

¶ 61    Plaintiff testified that Dr. Abariotis remained her mother's cardiologist until sometime in 2017, when they switched to a new cardiologist, Dr. Vohra. Plaintiff said her family made the change after they "learned that the warfarin 3 milligram was prescribed by [Dr. Abariotis's] office."

¶ 62    Following intubation, Sylvia had trouble swallowing. For a time, she was not permitted to drink liquids without a powdery thickener. Several days later, she was transferred to an "intermediate-type unit" and then "to the rehab unit" in the same hospital. She was finally discharged on December 23, 2016.

¶ 63    Plaintiff recalled that, following her discharge, her mother had "no energy, very poor appetite, needed help with walking." Her swallowing gradually improved but her voice "never came back to normal." Sylvia could no longer live independently. She needed assistance with daily activities such as bathing, and she needed a cane or walker.

¶ 64    Plaintiff recalled that a number of weeks later, her mother was hospitalized again with shortness of breath, after which she needed to have oxygen at home. After that point, a caregiver lived with her.

¶ 65    Plaintiff testified that her mother had very decreased energy, although she was able to attend a 100th birthday party. At that time, she was in a wheelchair and "couldn't really walk around or do anything."

¶ 66    On cross-examination, plaintiff acknowledged that her mother was 84 years old when she first became a patient of Dr. Abariotis and was 98 years old when she left Dr. Abariotis' care in 2017. During that time, Dr. Abariotis acted as her primary physician.

¶ 67    Plaintiff agreed that, as of November 2016, the warfarin dosage instructions were to take 1 milligram six times a week and 1.5 milligram one day a week. Plaintiff testified that she was probably the person who picked up the prescription containing 3-milligram pills on November 5, 2016.  Plaintiff was asked: "When you picked it up, did you check the receipt to make sure it was *** for the right patient and for the right dose?" She answered: "I don't think I did." However, she said she read the bottle to make sure it was warfarin. She acknowledged that the label on the bottle indicated that it contained 3-milligram tablets.

¶ 68    Plaintiff was shown Defendants' Exhibit 11, containing photographs of 1-milligram and 3-milligran warfarin pills. She agreed that the 1-milligram pills were pink in color, but that the pills she picked up on November 5, 2016, were tan. She also acknowledged that the pink pills were marked with a "1" and the tan pills were marked with a "3." She testified that she called Walgreens to ask about the color but did not know the name of the person she spoke to. She testified that she looked at the drug name on the bottle, but she "didn't look at the dosage."

¶ 69    Plaintiff acknowledged that pharmacy records showed a subsequent refill of 1-milligram warfarin tablets was submitted to Walgreens on November 7, 2016, or two days after she picked up the 3-milligram tablets. However, she did not recall ordering another bottle of warfarin.

¶ 70    On redirect examination, plaintiff testified that she did not look at the dosage on the bottle she picked up in November 2016 because it "never occurred to me that the 1 milligram would be changed after the years of always taking 1 milligram."

¶ 71                                          Virginia Shearin

¶ 72    Plaintiff also called her sister, Virginia Shearin. Virginia testified that in 2016, she was living "back and forth" between Toronto, Canada and Chicago, Illinois. She returned to Chicago on November 25, 2016.

¶ 73    Virginia recalled that in late November 2016, she noticed that her mother's warfarin pill was a different color. She called her sister Maryanne (plaintiff) about it, and plaintiff stated she called the pharmacy.

¶ 74    On November 29, 2016, Virginia noticed her mother's voice was scratchy and there was a bruise on the side of her neck. Virginia and two other sisters (Therese and Geri) took their mother to Resurrection Medical Center, where plaintiff met them. Virginia learned that Sylvia's "PT/INR number[s] were off the charts."

¶ 75    After her mother was admitted to the hospital, Virginia went home and removed the warfarin pills from her mother's weekly pill container. She noticed that the warfarin bottle indicated they were 3-milligram pills.

¶ 76    Virginia recalled that she and plaintiff brought this up with Dr. Abariotis in the hospital. She recalled that he "left the room, came back a few minutes later, and told us, "I just checked

with my office. It wasn't us.' " Virginia believed the "implication was that the pharmacy made a mistake."

¶ 77    Virginia recalled her mother was at the hospital through December 23, 2016. After her mother returned home, she did not have much energy and remained sitting most of the time. After that point, Virginia assisted her mother with basic tasks of daily living. Her mother was hospitalized again in March 2017, after which time she needed oxygen at home.

¶ 78    On cross-examination, Virginia stated her mother entered hospice care in December 2017. In September 2018, her mother turned 100 years old.

¶ 79                                    Dr. Abariotis

¶ 80    Plaintiff called Dr. Abariotis during her case. Dr. Abariotis testified that in 2009, Sylvia was hospitalized for atrial fibrillation and decompensated congestive heart failure. After that episode, her congestive heart failure was "compensated," meaning it was asymptomatic, until November 2016. He agreed that her health was stable through most of 2016.

¶ 81    He testified that he adjusted Sylvia's warfarin dose "every so often" to keep her INR within therapeutic range, but that he always prescribed 1-milligram tablets. He agreed that in 2015 and 2016, he authorized a number of prescriptions for 90 1-milligram tablets of warfarin, each of which was to be a three-month supply. Her dosing regimen was 1 milligram six days a week and 1.5 milligrams one day a week.

¶ 82    Dr. Abariotis acknowledged that in October 2016, he authorized a prescription for 90 tablets of 3-milligram warfarin tablets. He testified he did not remember how this prescription originated, but that he would not have changed the tablet size unless there was a "request either by the patient or a family member." However, he had no independent recollection of plaintiff requesting a 3-milligram tablet. He also acknowledged there is no record of plaintiff requesting a

3-milligram tablet. Dr. Abariotis had no independent recollection of discussing the October 2016 prescription for 3-milligram tablets or corresponding dosing instructions with plaintiff.

¶ 83 On redirect examination, Dr. Abariotis testified that he would not make a change to a 3-milligram pill "unless there was a request by the patient or the caregiver" and that he would discuss the change with them. He testified that "I will discuss that with the patient or the caregiver, and if I'm satisfied that the patient's competent and the caregiver is trustworthy, has the education, the background, the experience to deal with my instructions and follow those to the letter, then I would grant it [sic] the new strength." Dr. Abariotis testified that he "absolutely" believed that he could trust plaintiff to administer medications to Sylvia as he directed. He would not have ordered 3-milligram tablets, even if requested to do so, if he did not feel comfortable that the patient or caregiver could follow the dosing instructions.

¶ 84                                    Dr. Kenneth Nelson

¶ 85 Plaintiff's second medical expert witness, Dr. Kenneth Nelson, testified about the decrease in Sylvia's quality of life following the 2016 hospitalization for warfarin overdose. He testified that before the overdose, she was a very active 98-year-old, and her "activities of daily living were like cardiac rehab. They were exercise." He testified that she was never able to return to her "baseline condition" after the overdose.

¶ 86 He described complications Sylvia experienced from intubation, including difficulty swallowing and voice changes. He also testified that her heart condition deteriorated after her hospitalization, as she was no longer able to exercise. He believed that her heart "never fully recovered to that pre-warfarin overdose level."

¶ 87    Dr. Nelson testified that Sylvia's 2016 hospitalization led to decreased strength, balance, and difficulties with activities of daily living. He stated that her January 2017 hospitalization for pneumonia made her weaker.

¶ 88    After her March 2017 hospitalization, she suffered from shortness of breath and required oxygen at home. Dr. Nelson testified that with shortness of breath "[y]ou can get depressed" and "want to sit around more." He also testified that she began using wheelchairs and walkers and needed "24/7 care." He testified that depositions from Sylvia's family members indicated that her quality of life worsened and that she became less active. Sylvia continued to decline after her March 2017 hospitalization, and she began hospice care in December 2017.

¶ 89    Dr. Nelson was shown and asked about medical bills for Sylvia's care. He testified that her bills were reasonable.

¶ 90    Dr. Nelson also testified to his opinion that Dr. Abariotis was negligent in failing to inform Sylvia's family about changing to a 3-milligram tablet and failing to provide dosing instructions for a 3-milligram tablet.

¶ 91    Following Dr. Nelson's testimony, the parties entered a stipulation into the record that the medical bills and expenses were "fair, reasonable, usual and customary" for the services provided. However, defendants denied they were legally responsible for causing the need for treatment.

¶ 92                                    Courtney Nemer

¶ 93    Defendants called Courtney Nemer, a pharmacist who worked at the Walgreens pharmacy that filled the October 2016 prescription for 3-milligram warfarin tablets. Nemer testified that the order for 3-milligram tablets came through an "e-prescription that was sent over by the physician's office." Nemer confirmed that the prescription was picked up on November 5, 2016. Nemer said

her only role in filling the prescription was to verify that "what was in the bottle was what was labeled on the bottle."

¶ 94    Nemer confirmed that a refill of 1-milligram pills was ordered on November 7, 2016, but that order was not picked up until December 29, 2016.

¶ 95    Nemer testified that patients on warfarin are closely monitored through blood tests, and that dosing instructions can "fluctuate." She testified that it is "fairly common" for a patient to be prescribed two different-sized pills of warfarin, because dosing instructions can change based on the doctors' directions.

¶ 96    On cross-examination, Nemer confirmed that the warfarin prescriptions in October and November 2016 were ordered and authorized by Dr. Abariotis' office. She testified that either a pharmacist or a pharmacy technician would answer a call from a patient. She had no knowledge of any conversation between plaintiff and any pharmacy technician.

¶ 97                                    Dr. Ronald Berger

¶ 98    Defendants called Dr. Ronald Berger, a cardiologist, as an expert witness. He opined that Dr. Abariotis's warfarin dosing regimen for Sylvia —1 milligram six days a week and 1.5 milligrams one day a week—was within the standard of care. Dr. Berger testified that Dr. Abariotis's order for 3-milligram tablets did not change the dosing instruction, "because his practice was to dose in milligrams, which is usually what most cardiologists will do." Thus, he testified that the prescribed dosage in terms of milligrams did not change.

¶ 99    Dr. Berger testified it was within the standard of care for Dr. Abariotis to give dosing instructions to Sylvia's daughter (plaintiff) and rely on her to carry out the instructions. He agreed it was reasonable for Dr. Abariotis to believe that plaintiff "understood the difference between milligram[s] and tablets."

¶ 100   Dr. Berger also testified that it is not unusual for a cardiologist to prescribe two different strengths of warfarin to the same patient. He also said that it would not be unusual to order 90 tablets of 3-milligram pills, even if Sylvia would "only be taking one half tablet a week."

¶ 101   Dr. Berger was asked his opinion as to why there was a November 7, 2016 order for 1-milligram pills. He believed that "her normal supply would have run out about that time because she was taking it daily plus splitting it in half."

¶ 102   Dr. Berger separately opined that Sylvia's January 2017 hospital admission for pneumonia had "no relationship" to her prior hospitalization for warfarin overdose. He also opined that Sylvia's March 2017 hospitalization stemmed from the weakening of her heart due to the pneumonia.

¶ 103   Dr. Berger opined that following her discharge in December 2016, Sylvia returned to her baseline functioning before the March 2017 hospital admission. Dr. Berger testified that Sylvia was "doing well" when Dr. Abariotis last saw her in May 2017. Dr. Berger stated that Sylvia's heart condition worsened, that is, "decompensated," in the latter half of 2017.

¶ 104   Following Dr. Berger, the defense presented the video evidence deposition of Alex Spapperi. The trial transcript does not include that testimony. However, the record reflects that Spapperi worked in Dr. Abariotis' office as of October 2016. It is undisputed that Spapperi communicated Dr. Abariotis' authorization for the prescription for the 3-milligram tablets to the Walgreens pharmacy.

¶ 105                                    Dr. Abariotis

¶ 106   The defense then called Dr. Abariotis. He acknowledged that in October 2016, he authorized a prescription of 3-milligram warfarin tablets for Sylvia, which was submitted to the pharmacy by Spapperi. When asked why, he answered that "[t]here must have been a family

request" as he otherwise had "no good reason" to order 3-milligram pills. However, he had no recollection of a discussion with plaintiff about using a 3-milligram pill.

¶ 107   Dr. Abariotis testified that ordering a 3-milligram pill did not change the dosing instructions: "[T]he last dosing instruction was 1 milligram for six days and 1.5 milligrams the seventh day. So that 3-milligram pill was supposed to be cut in half to create that 1.5 milligram dose to be taken on the seventh day of the week."

¶ 108   He testified he had a number of patients who were taking two different-sized tablets, and that he customarily would explain to the caregiver how to dose each day. He testified that he would have said: "continue giving your mom 1 milligram for six days, and the 3 milligram will be cut in half. And the Sunday, *** now since you have the 3-milligram pill, you'll put only half a pill in the pill box for that particular day."

¶ 109   Dr. Abariotis recalled that on November 28, 2016, he went to the hospital after he learned Sylvia was admitted. He recalled seeing plaintiff in the hospital. He testified that plaintiff told him that he was not at fault.

¶ 110   Dr. Abariotis testified that Sylvia's January 2017 hospitalization was caused by coming into contact with someone who had viral pneumonia. He stated it had nothing to do with her warfarin overdose.

¶ 111   During closing argument, plaintiff's counsel argued that it defied common sense to suggest plaintiff requested a prescription containing 3-milligram tablets, and that the prescription was "very clearly a mistake" by defendants.

¶ 112   With respect to damages for medical expenses, counsel argued:

> "[T]he reasonable expense[s] of necessary medical care, treatment,
> and services rendered in this case are *** $578,489.99. *** And

while this is a sizable figure, we need to remember that this line item of damages doesn't go into the estate. It goes toward satisfying medical debts, satisfying debts that were incurred—

[Defense counsel]: Objection, your Honor.

THE COURT: Overruled. Ladies and gentlemen, this is argument and not evidence.

[Plaintiff's counsel]: Satisfying debts that were incurred because of the defendants' negligence. Folks, allowing these medical bills to be paid simply pulls plaintiff out of the red. This is the easiest damage to award. It puts her back at zero, but being put back at zero isn't fair and full justice. It doesn't take into account the other harms and losses suffered."

¶ 113                                    Verdict and Judgment

¶ 114    After approximately two days of deliberations, the jury returned a plaintiff's verdict and awarded damages totaling $1,365,000. Specifically, the jury awarded the following itemized damages: $465,000 for medical expenses; $400,000 for pain and suffering; $400,000 for loss of normal life; and $100,000 for emotional distress.

¶ 115    The court entered judgment on the jury's verdict. Pursuant to section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)), the court awarded prejudgment interest at 6% per annum, accruing from the statute's effective date of July 1, 2021, resulting in the amount of $56,544.66.

¶ 116                                    Post-Trial Motion

¶ 117   Defendants filed a post-trial motion, seeking judgment notwithstanding the verdict (JNOV) on the ground that plaintiff did not meet her burden of proof. In the alternative, defendants sought a new trial based on: (1) the trial court's ruling excluding reference to plaintiff's background and experience as a nurse; (2) the portion of plaintiff's closing argument referring to debts from medical expenses; and (3) alleged errors in jury instructions.

¶ 118   In the alternative to JNOV or a new trial, defendants sought remittitur on the basis that the jury's award indicated it was "moved by passion or prejudice." Separately, defendants argued that under section 2-1205 of the Code of Civil Procedure, they were entitled to a reduction of the medical expense award by $283,631.61, to account for downward adjustments to the amounts initially billed by Sylvia's medical providers, based on the contractual relationship between the providers and Medicare, Sylvia's insurer. Defendants separately argued that the award of postjudgment interest pursuant to section 2-1303(c) must be stricken as unconstitutional.

¶ 119   The post-trial motion was argued on September 27, 2022. In a written order entered on January 3, 2023, the court denied the post-trial motion in all respects. Defendants appealed.

¶ 120   ANALYSIS

¶ 121   On appeal, defendants assert alternative arguments that (1) that they are entitled to JNOV; (2) that they are entitled to a new trial; (3) they are entitled to remittitur; (4) they are entitled to reduction of the medical expense award pursuant to section 2-1205 of the Code; and (5) the award of prejudgment interest should be vacated as unconstitutional. For the following reasons, we find these arguments are without merit.

¶ 122   Defendants Are Not Entitled to JNOV

¶ 123   Assuming *arguendo* that defendants were entitled to JNOV, there would be no need to address their other claims of trial error or their arguments seeking a reduction of damages. Thus,

we first address defendants' claim that they are entitled to JNOV because plaintiff's expert testimony was insufficient to meet her burden of proof. They argue her experts relied on speculation and "offered conclusions resting on a concoction of key facts." They suggest that Dr. Shadoff's opinion that the 3-milligram prescription breached the standard of care was based on "speculation" that Dr. Abariotis failed to communicate the dosing instructions to plaintiff. They also suggest that both Dr. Shadoff and Dr. Nelson offered improper speculative opinions that the change to a 3-milligram pill would cause "confusion" on the part of plaintiff. For the following reasons, we disagree.

¶ 124 A JNOV should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In ruling on a motion for a judgment n.o.v., a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses." *Id.* "[T]he appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Id.* at 452-53. "The court has no right to enter a judgment n.o.v. if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witness or the determination regarding conflicting evidence is decisive to the outcome. [Citations.]" *Id.* at 454.

¶ 125 "A motion for a judgment n.o.v. presents a question of law as to whether there was a complete failure to substantiate a key element of the plaintiff' case," and the trial court's ruling is subject to *de novo* review. *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 59.

¶ 126   In this case, defendants suggest that plaintiff failed to establish her negligence case because her experts' testimony was based on speculation rather than facts. "A plaintiff must present at least some evidence on every essential element of the cause of action or the defendant is entitled to judgment in his or her favor as a matter of law. [Citation.]" *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123 (2004). In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care. *Id.* at 112 . Unless the medical professional's negligence is "grossly apparent" or the treatment at issue is within the common knowledge of a layperson, "expert medical testimony is required to establish the applicable standard of care and the medical professional's deviation therefrom*." Gulino*, 2015 IL App (1st) 131587, ¶ 60. Similarly, the element of proximate causation "must be established by expert testimony to a reasonable degree of medical certainty. [Citation.]" *Susnis ex rel. Susnis v. Radfar*, 317 Ill. App. 3d 817, 826-27 (2000). "The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible." *Id.* at 827 (citing *Saxton v. Toole*, 240 Ill. App. 3d 204, 210-11 (1992)). While testimony based on known facts is proper, "conclusory opinions based on sheer, unsubstantiated speculation should be considered irrelevant. [Citations.]" *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 293 (2008).

¶ 127   Here, defendants suggest that the opinions of Dr. Shadoff and Dr. Nelson regarding the alleged failure in communicating the change to 3-milligram tablet and any resulting confusion were improper because they were based on improper speculation, not facts.

¶ 128    We disagree, keeping in mind that JNOV is not proper if the evidence, "together with reasonable inferences to be drawn therefrom" demonstrates a "substantial factual dispute." *Maple*, 151 Ill. 2d at 454. Here, there was some factual evidence supporting plaintiffs' experts' theory of the case—*i.e.*, that the 3-milligram prescription resulted from a mistake by defendants. Those experts' opinions cannot be discounted as mere speculation. To be sure, there was a factual dispute as to the origin of the 3-milligram prescription and the substance of any related communications (if any) between plaintiff and Dr. Abariotis. Plaintiff testified she was not informed that 3-milligram tablets had been prescribed instead of the usual 1-milligram tablets, whereas Dr. Abariotis testified that he would not have authorized a change to 3-milligram tablets without first discussing their use and dosing instructions with plaintiff. Yet, there was at least *some* factual, non-speculative evidence supporting plaintiff's theory of the case, namely (1) plaintiff's testimony that she was not instructed about the use of 3-milligram tablets; and (2) the lack of any recording or documentation to show that Dr. Abariotis or his office communicated with plaintiff about the 3-milligram prescription. Given that evidence, we cannot say it was improper speculation for plaintiff's experts to opine that defendants breached their standard of care by failing to adequately communicate dosing instructions to plaintiff. Similarly, insofar as plaintiff testified that she had no knowledge that the October 2016 prescription contained 3-milligram pills, there was a factual basis for the experts to testify about the potential for confusion resulting from a change from 1-milligram pills to 3-milligram pills.

¶ 129    We reiterate that JNOV would only be proper if the evidence, *viewed most favorably to the plaintiff*, so overwhelmingly favored defendants that the verdict could not stand; JNOV is not proper if the evidence demonstrates a "substantial factual dispute." *Maple*, 151 Ill. 2d at 454. Here, fact witness testimony showed a clear factual dispute as to whether Dr. Abariotis advised or

instructed plaintiff about giving the 3-milligram warfarin tablets to her mother. Given that evidence, plaintiff's experts permissibly testified to their opinion that Dr. Abariotis breached the standard of care by failing to give necessary instructions for that prescription. It was for the jury to evaluate the credibility of the conflicting fact and expert witnesses. As the evidence was not overwhelmingly in favor of defendants, they were not entitled to judgment notwithstanding the verdict.  Thus, we reject defendants' assertion that they were entitled to JNOV.

¶ 130          The Court Did Not Err in Barring Reference to Plaintiff's Nursing Background

¶ 131   We turn to defendants' argument that they are entitled to a new trial because they were "handcuffed" by the trial court's rulings, both before and during trial, barring reference to plaintiff's background and experience as a nurse. They suggest that plaintiff's nursing background was crucial to explain to the jury why Dr. Abariotis's conduct in prescribing 3-milligram pills was not negligent for this particular patient and caregiver. They maintain that Dr. Abariotis should have been able to explain that because he knew of plaintiff's nursing background, he reasonably relied on her ability to follow the dosing regimen for her mother, Sylvia. They note that at trial, he testified that he would have ordered a pill of a different strength only if he believed the caregiver was able to follow his instructions. Defendants emphasize that due to the court's rulings, Dr. Abariotis could not mention that plaintiff was in fact a nurse. They argue that such testimony "was admissible to explain the reasonableness of Dr. Abariotis' conduct" given his knowledge that plaintiff had "professional experience in managing the administration of medication."

¶ 132   Apart from challenging the pretrial ruling on this topic, defendants urge that Dr. Shadoff's testimony "opened the door" to plaintiff's nursing background, when he testified that non-physicians and "common laypeople" think of medications in terms of the number of tablets, rather than milligrams. Despite that testimony, the trial court did not permit reference to plaintiff's

nursing background. Defendants urge that this hampered their ability to fairly and fully cross-examine plaintiff's experts.

¶ 133   For the following reasons, we disagree and decline to find error in the trial court's rulings as to plaintiff's nursing background.

¶ 134   "A trial judge has discretion in granting a motion *in limine* and a reviewing court will not reverse a trial court's order allowing or excluding evidence unless that discretion was clearly abused." *Swick v. Liautaud*, 169 Ill. 2d 504, 521 (1996).

¶ 135   Rule 401 of the Illinois Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Under Rule 402 of the Illinois Rules of Evidence, all relevant evidence generally is admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011).

¶ 136   Notably, the parties do not dispute that plaintiff's nursing background had at least some relevance as to the question of whether Dr. Abariotis met the applicable standard of care, *i.e.* whether he acted reasonably under the circumstances. See *Advincula v. United Blood Services*, 176 Ill. 2d 1, 23 (1996) ("In Illinois, the established standard of care for all professionals is stated as the use of the same degree of knowledge, skill and ability as an ordinarily careful professional would exercise under similar circumstances.").[3] Nevertheless, under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair

---

[3] Accordingly, in this case, the jury was instructed that: "The failure to do something that a reasonably careful cardiologist would do, or the doing of something that a reasonably careful cardiologist would not do, *under circumstances similar to those shown by the evidence*, is 'professional negligence.' **** The law does not say how a reasonable careful cardiologist would act *under these circumstances*. That is for you to decide." (Emphases added).

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011); see also *People v. Walker*, 211 Ill. 2d 317, 337 (2004) ("Illinois courts have long recognized, as a matter of common law, that a trial court may exercise its discretion to exclude evidence even when it is relevant, if its prejudicial effect substantially outweighs its probative value. [Citation.]")

¶ 137    In granting plaintiff's motion *in limine* to bar evidence referring to her nursing background, the trial court apparently concluded that under Rule 403, the risks of undue prejudice and jury confusion "substantially outweighed" the probative value of such evidence. Ill. R. Evid. 403. Defendants suggest this was an abuse of discretion, given the importance of plaintiff's nursing background to their theory of the case, *i.e.*, that Dr. Abariotis' conduct regarding the 3-milligram prescription was not unreasonable under the circumstances.

¶ 138    Keeping in mind the deferential standard, we cannot say the trial court abused its discretion in precluding defendants from eliciting evidence referencing plaintiff's background as a nurse. We think it is apparent that reference to plaintiff's nursing background could be both confusing to the jury, as well as unduly prejudicial. The trial court reasonably concluded that those risks substantially outweighed any probative value in evidence of plaintiff's nursing experience.

¶ 139    As to the potential for jury confusion, it is clear that adding plaintiff's nursing background could detract from the central issue in the case—whether Dr. Abariotis was negligent. Had the court permitted reference to plaintiff's background as a nurse, the jury could easily have been distracted from assessing *his* conduct and could have improperly focused on the reasonableness of *plaintiff's* conduct. That would clearly be inappropriate, especially since defendants did not raise an affirmative defense of contributory negligence.

¶ 140 Similarly, admission of such evidence would be unduly prejudicial because it would suggest to the jury that plaintiff should be held to a higher standard of care, without any corresponding expert testimony. Notably, defendants did not identify an expert to inform the jury of the standard of care applicable to someone with plaintiff's nursing background, under these circumstances. That is, there was no expert testimony to assist the jury in determining whether plaintiff (given her nursing experience) should have recognized that the prescription at issue contained 3-milligram tablets instead of the usual 1-milligram tablets, and thus avoided giving her mother the larger pills. It would be improper for the defendants to simply elicit the fact that she was a nurse and then argue that she must have had this duty and responsibility by virtue of her nursing background. We reiterate that it was plaintiff's burden to show that *Dr. Abariotis* was negligent in prescribing the 3-milligram pills without adequately instructing plaintiff. But allowing evidence of plaintiff's nursing background would essentially shift the central question from *defendants'* conduct to whether plaintiff could show it was not *her fault* that her mother received the incorrect dosage by failing to realize that the warfarin pill was larger than it had been in the past. The trial court correctly recognized that allowing evidence of plaintiff's nursing background thus risked misleading or confusing the jury about the correct standard of care upon which it was to decide the case. We cannot say the trial court's "discretion was clearly abused" in barring such evidence. *Swick*, 169 Ill. 2d 504, 521 (1996). Thus, we find no error with respect to the ruling on the plaintiff's motion *in limine* barring reference to her nursing experience.

¶ 141 Defendants additionally argue that, even if the importance of plaintiff's nursing background was not apparent at the outset of trial, its relevance increased following the testimony of plaintiff's expert, Dr. Shadoff. He expressed his view that a switch to 3-milligram tablets from 1-milligram tablets could be "confusing" because non-physicians think of medication dosages "in

tablets. They don't necessarily think of it as milligrams." During redirect examination, plaintiff's counsel reiterated that "common laypeople are thinking" in terms of the number of tablets rather than milligrams, and Dr. Shadoff agreed: "Yes. Nonphysicians think of it that way."

¶ 142    Defendants complain that the trial court's ruling precluded defense counsel from challenging the "layperson" testimony with reference to plaintiff's nursing background. They suggest they were denied their right to fully cross-examine Dr. Shadoff, insofar as they were barred from asking him about whether plaintiff's nursing background impacted his opinions.

¶ 143    Notwithstanding the cited instances of Dr. Shadoff's testimony, we do not think it compels the conclusion that the trial court abused its discretion in continuing to bar evidence of plaintiff's nursing background. Even after Dr. Shadoff's testimony, the court could reasonably find that the probative value of any reference to plaintiff's nursing background was substantially outweighed by the risk of resulting jury confusion and undue prejudice. The same risks of misleading the jury already discussed were still present after Dr. Shadoff's testimony. As plaintiff states in her briefing, the court could find that the probative value of her nursing background was substantially outweighed by the "likelihood of confusing and/or misleading the trier of fact into applying the professional duty owed by Dr. Abariotis to his patient, Sylvia, to [plaintiff] as a nurse versus as her mother's caregiver." Especially as defendants did not assert an affirmative defense of contributory negligence or identify a nursing expert, it would be improper for defendants to suggest (through cross-examination of Dr. Shadoff or otherwise) that the jury's focus should be on whether plaintiff failed to act as a nurse should. The court could reasonably conclude that this would mislead the jury from the relevant questions in assessing whether defendants were negligent.

¶ 144    We also note that, although the trial court barred reference to plaintiff's nursing credentials and experience, there was no order that barred defendants from generally eliciting testimony that

plaintiff was a highly educated professional with bachelor's and master's degrees. This undermines defendants' claim that their defense was unduly hampered by the court's rulings. That is, even without explicitly referencing plaintiff's nursing experience, defendants could have argued that, given plaintiff's high level of education, Dr. Abariotis reasonably believed that she could have followed his instructions. Further, defendants could have argued (without mentioning nursing) that it was implausible that someone with plaintiff's level of education would fail to check the dosage information stated on the label of the pill bottle, especially after she noticed that the color of the pill was different. Here, plaintiff testified that the color of the pill prompted her to call Walgreens, yet she claimed she did not ask about the dosage of the pill, nor did she check the size of the pill stated on the label. Defendants could have argued her level of education made this testimony less credible, even without mentioning her nursing background.

¶ 145   In short, we cannot say that the trial court abused its discretion in precluding reference to plaintiff's nursing background, either in its ruling on plaintiff's motion *in limine* or its subsequent rulings during trial. We thus decline defendants' request for a new trial on that basis.

¶ 146        Counsel's Remarks in Closing Argument Do Not Warrant A New Trial

¶ 147 We turn to defendants' independent contention that they are entitled to new trial due to improper remarks in plaintiff's closing argument. Specifically, defendant urge that plaintiff's counsel made an "improper, emotional plea" to the jury in the following remarks regarding medical expenses:

> "[T]he reasonable expense of necessary medical care, treatment, and
>
> services rendered in this case are *** $578,489.99. *** And while
>
> this is a sizable figure, we need to remember that this line item of

> damages doesn't go into the estate. It goes toward satisfying medical
>
> debts, satisfying debts that were incurred—
>
> [Defense Counsel]: Objection, your Honor.
>
> THE COURT: Overruled. Ladies and gentlemen, this is argument
>
> and not evidence.
>
> [Plaintiff's counsel]: Satisfying debts that were incurred because of
>
> the defendants' negligence. Folks, allowing these medical bills to be
>
> paid simply pulls plaintiff out of the red. This is the easiest damage
>
> to award. It puts her back at zero, but being put back at zero isn't
>
> fair and full justice. It doesn't take into account the other harms and
>
> losses suffered."

¶ 148   Defendants contend that these remarks suggested to the jury that plaintiff was "facing financial ruin" from medical bills for Sylvia's care, when in fact these expenses were paid by Medicare. Thus, defendants claim the remarks violated the principles that closing argument must be based on evidence or reasonable inferences from the facts, and that closing argument should not reference the parties' financial status. Defendants similarly claim that the remarks violated a pretrial order granting a defense motion *in limine*, under which the parties were "barred from presenting evidence regarding the financial status of any party to this action." Defendants thus contend the closing argument deprived it of a fair trial.

¶ 149   Our review of the record leads us to conclude that these brief remarks, however improper, were not prejudicial to warrant reversal.

¶ 150   "The purpose of argument is to draw reasonable inferences from the evidence and assist the jury in fairly arriving at a verdict based on the law and the evidence." *Copeland v. Stebco*

*Products Corp.*, 316 Ill. App. 3d 932, 948 (2000). "It is error for counsel to appeal to the passions of the jury" and "[c]ounsel must confine closing argument to matters that are in evidence and to reasonable inferences drawn from the evidence." *Id.*

¶ 151 Nonetheless, "[i]n making closing arguments, attorneys are generally given broad latitude. [Citation.]" *Weisman v. Schiller, Ducanto and Fleck, Ltd.*, 368 Ill. App. 3d 41, 48 (2006). "The trial court has discretion in the scope of a closing argument and its judgment as to the propriety of comments therein will not be reversed unless they were of such character that they prevented the opposing party from receiving a fair trial." *Id.* Trial court rulings regarding the content of closing argument "will be upheld, absent an abuse of discretion." *Heeg v. Jewel Companies*, 232 Ill. App. 3d 75, 84 (1992).

¶ 152 Importantly, the mere existence of some improper comments will not mandate reversal. Rather, "[i]mproper comments during closing argument are not reversible error unless substantial prejudice is shown." *McHale v. W.D. Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 45. "A reviewing court will not grant a new trial unless the argument clearly was improper, prejudicial and denied defendant a fair trial when that trial is viewed in its entirety." *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1065 (2001).

¶ 153 Viewing the totality of the evidence and arguments presented to the jury in this case, we do not find that defendants can demonstrate "substantial prejudice" from the brief comments at issue, even if they were improper.

¶ 154 We recognize that "[r]eference to the parties' financial condition is impermissible during closing argument." *McHale*, 2015 IL App (1st) 132625, ¶ 44 (citing *Thomas v. Johnson Controls*, 344 Ill. App. 3d 1026, 1036 (2003)). Defendants suggests that by referring to "debts" and saying plaintiff was "in the red," her counsel used "inflammatory rhetoric" to imply that plaintiff was

"impecunious"; *i.e*., that she was "in financial ruin" due to her mother's medical expenses. Defendants suggest that plaintiff's counsel urged the jury to "provide a windfall based on sympathy" for her financial condition, and that the jury's verdict was likely influenced by these particular comments.

¶ 155   We do not believe defendants can show the requisite prejudice from the brief remarks at issue. While we agree that it was improper for plaintiff's counsel to argue that an award for medical expenses would "pull[] plaintiff out of the red" and "put[] her back at zero," we do not think they were nearly as inflammatory or prejudicial as defendants suggest. The reference to outstanding debts is simply not the same as stating that plaintiff is in financial ruin. In context of the lengthy trial and arguments, we do not think these brief comments risked inciting the jury to award damages based on sympathy or facts not in evidence. Moreover, we note that when defense counsel objected during the comments at issue, the trial court overruled the objection but also stated: "Ladies and Gentlemen, *this is argument and not evidence*." (Emphasis added.) This admonition further reduced the risk that the jury was unduly influenced by the challenged comments.

¶ 156   We likewise do not find reversible error, even if the comments violated the pretrial order barring parties from "presenting evidence regarding the financial status of any party to this action." We recognize that "[a]n improper insinuation during closing argument that violates an *in limine* order can be the basis for a new trial." *McHale*, 2015 IL App (1st) 132625, ¶ 45. Yet, there is no "reversible error unless substantial prejudice is shown." *Id*. Defendants simply do not articulate a basis for us to discern how substantial prejudice resulted from the brief, isolated remarks at issue.

¶ 157   In short, we do not find that defendants could have suffered substantial prejudice or were deprived of a fair trial based on the challenged remarks at closing argument. Thus, we reject their request for a new trial on this basis.

¶ 158 <u>The Alleged Rule 213 Violation Is Not Reversible Error</u>

¶ 159 We next address defendants' contention that they were deprived of a fair trial because plaintiff improperly presented expert testimony that had not been disclosed under Supreme Court Rule 213. Defendants cite Dr. Shadoff's criticism that the prescription for 90 3-milligram pills would have lasted over three years, *i.e*., longer than the medication's shelf life. They also point to his testimony that this violated DEA regulations because "[t]he most you can prescribe according to the DEA, is one year without re-evaluating the patient." Notably, although the court initially overruled the defense objection to that testimony, after further discussion the court told the jury that it "should be stricken and disregarded" and that "you are not to use that in your consideration of the evidence." Defendants suggest that they were prejudiced nonetheless.

¶ 160 Rule 213 requires that for each controlled expert witness, the party must identify the subject matter on which the witness will testify, as well as the "conclusions and opinions of the witness and the bases therefore." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). "The purpose behind Rule 213 is to avoid surprise and to discourage tactical gamesmanship." *Sullivan*, 209 Ill. 2d at 111. "The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. [Citations.]" *Id*. at 109.

¶ 161 Here, defendants acknowledge that the trial court directed the jury to disregard Shadoff's testimony referring to DEA regulations. Nonetheless, they claim that the jury was "left with the indelible impression that Dr. Abariotis had committed a serious offense: writing a prescription in violation of federal law." Defendants also point out that plaintiff's counsel in closing argument stated that the 90 tablets "would have lasted Sylvia Shearin more than three and a half years," telling the jury this was a "clear violation of the standard of care." Defendants suggest that Dr. Shadoff's non-disclosed criticisms "likely contributed to the inflated verdict" in plaintiff's favor.

¶ 162    Significantly, we keep in mind that even the erroneous admission of evidence will not be grounds for reversal unless there was substantial prejudice. See *Yanello v. Park Family Dental*, 2017 IL App (3d) 140926, ¶ 33 (If a trial court abuses its discretion in the admission of evidence, "a new trial should be ordered only if the trial court's ruling appear to have caused substantial prejudice affecting the outcome of the trial."); *Martin v. Sally*, 341 Ill. App. 3d 308 (2003) (concluding that although expert testimony was improperly admitted, reversal was not warranted where the error was not prejudicial).

¶ 163    Here, the trial record does not support defendants' claim that they were prejudiced by Dr. Shadoff's criticisms of the quantity of pills in the prescription. Insofar as Dr. Shadoff testified that "according to the DEA" the most a physician can prescribe is a one-year supply, the trial court explicitly instructed the jury to disregard that testimony. "Absent any evidence to the contrary, we will presume the jury adhered to the trial court's instruction and only considered admissible evidence in reaching its verdict." *Neuhagen v. Global Experience Specialists, Inc.*, 2018 IL App (1st) 160322, ¶ 156. The record shows that the DEA was not subsequently mentioned during plaintiff's case or argument. We cannot presume the jury improperly relied on the single mention of the DEA.

¶ 164    Defendants maintain we should infer they were prejudiced by Dr. Shadoff's undisclosed opinion criticizing the number of 3-milligram pills. As support, they cite plaintiff's counsel's comments in closing argument that the 90-pill quantity would have lasted more than three years and was a "clear violation of the standard of care." We note that the defense did not contemporaneously object to those comments and thus waived any objection thereto. See *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 25 (2000). In any event, those comments do not convince us that defendants were prejudiced. Viewed in context of the entire argument, the comment about

the quantity of pills was made in the course of urging the jury that the prescription for 3-milligram pills must have been a mistake by Dr. Abariotis, rather than a deliberate choice after consulting with plaintiff. This was the central fact dispute for the jury.

¶ 165   In short, to the extent that Dr. Shadoff offered opinions that were undisclosed pursuant to Rule 213, we do not find a basis in the record to conclude defendants suffered substantial prejudice. We thus reject defendants' request for reversal on that basis.

¶ 166                        Claims of Error Regarding Jury Instructions

¶ 167   We turn to defendants' contention that they were deprived of a fair trial because the court erred in giving two improper damage instructions. First, defendants claim that the court erred when it gave the Illinois Pattern Instruction (IPI) permitting damages for aggravation of a pre-existing condition, IPI (Civil) 30.21. That instruction states: "If you decide for the plaintiff on the question of liability, you may not deny or limit the plaintiff's right to damages resulting from this occurrence because any injury resulted from [an aggravation of a pre-existing condition] [or] [a pre-existing condition which rendered the plaintiff more susceptible to injury]."*Id.*

¶ 168   "Whether to provide a particular jury instruction is within the sound discretion of the trial court, and the court's decision will be reversed only where the trial court abused its discretion. [Citation.]" *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 17. A trial court does not abuse its discretion if, "taken as a whole, the instructions fairy, fully, and comprehensively apprised the jury of the relevant legal principles." (Internal quotations omitted.) *Id.*

¶ 169   With respect to IPI (Civil) 30.21, defendants claim it was improper because the parties did not present evidence suggesting that Sylvia's "cardiac condition impacted her claimed injuries." Thus, they claim the aggravation instruction "urged the jury to inflate the damage award." This contention is refuted by the record, insofar as plaintiff's experts testified that the warfarin overdose

and corresponding hospitalization exacerbated her pre-existing heart condition. Dr. Shadoff testified that Sylvia's congestive heart failure was "exacerbated by the stress of the warfarin overdose." Dr. Nelson testified that Sylvia's daily activities before the warfarin overdose were like "cardiac rehab" and "medicine to her heart in therapy form", but "when that was taken away and then you have an insult of the heart failure exacerbation during that overdose period, *** her underlying conditions get worse."

¶ 170 Defendants additionally claim that the trial court erroneously overruled defendants' objection to the jury verdict form, which contained a line for damages from "emotional distress experienced," separate from damages for "pain and suffering experienced." They claim that the "case law does not support a separate award for emotional distress" and that there was no evidence of emotional distress.

¶ 171 Defendants are incorrect. In *Babikian*, 2011 IL App (1st) 102579, this court rejected a claim of error in a medical negligence case based on the court's instruction that jurors "could award damages for pain and suffering and also for emotional distress, if they determined that such damages were proved to have resulted from the defendants' negligence." *Id*. ¶ 18. This court expressly held that "[d]amages for emotional distress are available to prevailing plaintiffs in cases involving personal torts such as medical negligence." *Id*. ¶ 19 (citing *Clark v. Children's Memorial Hospital,* 2011 IL 108656). This court specifically rejected the argument that a separate line on the verdict form for emotional distress damages "induced the jury to grant the plaintiff a double recovery for her mental pain and suffering." *Id*. ¶ 20. We acknowledge that the Fourth District has disagreed with *Babikian*, upon concluding that "suffering" includes "emotional distress." *Marxmiller v. Champaign-Urbana Mass Transit District*, 2017 IL App (4th) 160741, ¶¶ 51-53 (cautioning that because emotional distress is a component of "suffering," there is a risk of a double

recovery when the verdict form itemizes them separately). However, we elect to follow the precedent from our district.

¶ 172   Defendants' claim that there was "no evidence of emotional distress" is also belied by the record. Plaintiff and her sister Virginia testified about the deterioration in Sylvia's quality of life, loss of independence in her daily activities, and her limited ability to participate in social activities she formerly enjoyed following the warfarin overdose. This was sufficient for the jury to conclude she suffered emotional distress.

¶ 173   Thus, we reject the defendants' request for a new trial on the basis of jury instructions.

¶ 174                    Defendants Have Not Shown Grounds for Remittitur

¶ 175   In the alternative to its arguments for new trial, defendants ask for remittur of the verdict, which they claim is excessive. Specifically, they challenge the $100,000 award for emotional distress on the ground that it is duplicative of the jury's separate awards of $400,000 each for "pain and suffering" and "loss of normal life experienced." They also challenge the award of past medical expenses of $465,000 as being the result of "prejudice or passion," citing the previously-discussed remarks in plaintiff's closing argument.

¶ 176   "The inherent power of a court to order a remittitur of excessive damages, in appropriate and limited circumstances, is long recognized and accepted." *Miyagi v. Dean Transportation, Inc.,* 2019 IL App (1st) 172933, ¶ 20. "A remittitur should be employed only when the damages award (1) falls outside the range of fair and reasonable compensation, (2) appears to be the result of passion or prejudice, or (3) is so large that it shocks the judicial conscience. [Citation.]" *Id*. However, remittitur "should not be employed when the award falls within the flexible range of conclusions that can be reasonably supported by the facts.[Citations.]" *Id*.

¶ 177   We do not find remittitur appropriate in this case. With respect to the $100,000 award for emotional distress, defendants apparently assume that this amount represents a double recovery because the jury separately awarded damages for "pain and suffering" and "loss of normal life experienced." However, there is nothing from the record for us to conclude that that the jury was duplicating damages for mental distress that it had already factored into those separate awards. The jury could have reasonably concluded that Sylvia's emotional distress deserved compensation, apart from damages for physical pain and suffering and loss of normal life. Because the emotional distress award fell within the range of conclusions reasonably supported by the facts, remittitur of that award is inappropriate.

¶ 178   In requesting remittitur of the $465,000 award for medical expenses, defendants essentially repeat their argument that plaintiff's closing argument improperly referred to debts and signaled that plaintiff was in poor financial condition. Defendants assert that the jury was "undoubtedly moved by counsel's representation of a massive personal debt." Defendants point out that the record reflects that the bills for Sylvia's care were paid for by Medicare or other insurance, rather than by plaintiff.

¶ 179   Nevertheless, we cannot say the medical expense award was the product of "prejudice or passion," resulting from closing argument. Importantly, the parties entered into a stipulation that medical bills totaling approximately $578,000 were "fair, reasonable, usual and customary charges for the services provided." In other words, the jury's award of $465,000 was approximately $113,000 *less* than the stipulated amount of reasonable medical expenses. Given this, it is hard to see how defendants can demonstrate that the $465,000 award was excessive or the product of inflammatory comments.

¶ 180    Recognizing this discrepancy, defendants' brief suggests that the $113,000 difference between the stipulated total expenses and the jury's actual award might be explained by a comment by plaintiff's counsel in rebuttal argument, in which counsel acknowledged the jury might find that hospice expenses were a product of Sylvia's advanced age.[4] That is, defendants maintain that the jury's award of $465,000 was influenced by "plaintiff's improper and factually erroneous argument." This is simply speculation as to how the jury arrived at the final figure, which is not sufficient basis for remittitur. Defendants cannot point to anything in the record that demonstrates that the $465,000 award for medical expenses was the result of passion or prejudice. Thus, we reject defendants' request for remittitur.

¶ 181          Defendants' Request for Reduction Pursuant to 735 ILCS 5/2-1205

¶ 182    We turn to defendants' argument that, pursuant to section 2-1205 of the Code of Civil Procedure (735 ILCS 5/2-1205 (West 2022)), the $465,000 award of medical expenses should be reduced by $283,631.61. They aver that, due to the contractual relationship between Sylvia's insurer (Medicare) and her medical providers, Sylvia's medical bills "were adjusted down to $294,858.38, resulting in a benefit to [Sylvia] of $283.631.61."[5] Defendants urge that section 2-1205 provides for a reduction corresponding to the amount by which the billed amounts were

---

[4] The stipulation reflected that hospice expenses totaling $188,471,52 were incurred between December 2017 and April 2019. In its rebuttal, plaintiff's counsel remarked that: "[Defense counsel] is suggesting that you don't even compensate for the bills. And let's say that, you know, everyone goes on hospice later in life, not everybody, but she's 98 years old, she is expected to go on hospice even though it's our contention that that was premature, the bills are still over $400,000."

[5] For example, the record on appeal includes a statement from Resurrection Medical Center showing "Total Charges" of $277, 262.82. However, that statement also shows "Adjustments" for Medicare of over $250,000, whereas the only actual payment from Medicare was $24,619.19, a fraction of the total amount initially billed.

adjusted or "written off"—regardless of whether such amounts were ever paid to medical providers.

¶ 183   Plaintiff responds that section 2-1205 does not apply because it only permits a reduction of a medical expense award reflecting amounts that were *actually paid* by an insurer, but does not contemplate a reduction merely for "write-offs." In this regard, plaintiff suggests we follow the Fourth District's analysis of the statute in *Miller v. Sarah Bush Lincoln Health Center*, 2016 IL App (4th) 150728. We agree with plaintiff.

¶ 184   Before delving into the specific language of the section 2-1205, we note that it represents a modification of the collateral source rule. See *Willis v. Foster*, 229 Ill. 2d 393, 400 (2008) ("The legislature has modified the collateral source rule in section 2-1205 and 2-1205.1 of the Code of Civil Procedure"); *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, ¶ 120 ("Section 2-1205 represents an exception to the collateral source rule"). Thus, review of the collateral source rule informs our analysis.

¶ 185   "Under the collateral source rule, benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor." (Internal quotation marks omitted.) *Willis*, 229 Ill. 2d at 399. The rule is "an established exception to the general rule that damages in negligence actions must be compensatory." (Internal quotation marks omitted.) *Id*. "As a substantive rule of damages, the rule bars a defendant from reducing the plaintiff's compensatory award by the amount the plaintiff received from the collateral source." *Id*. (quoting *Arthur v. Catour*, 216 Ill. 2d 72, 80 (2005)). In *Arthur*, the supreme court held that a plaintiff "was entitled to submit the full amount of her charged medical bills to the jury and was not limited to presenting the reduced rate actually paid by her private insurer." *Id*. at 401.

¶ 186    Notably, in *Willis*, our supreme court applied the collateral source rule to permit recovery of medical expenses billed but discounted (*i.e.,* written off) by Medicaid and Medicare. The *Willis* plaintiff sustained injuries in an accident, resulting in medical bills totaling $80,163.47. *Id.* at 395. However, "the amount actually paid by Medicaid and Medicare on plaintiff's behalf, in full settlement of the bills, was $19,005.50." *Id*. at 396. The jury awarded plaintiff the full amount of the medical bills, plus damages for pain and suffering. *Id*. The trial court subsequently granted a defense motion to reduce the medical expenses award to the amount paid by Medicare and Medicaid. *Id*.

¶ 187    On appeal, plaintiff argued that the reduction in damages violated the collateral source rule, but the Fourth District affirmed the trial court. See *id*. at 397. Following plaintiff's leave to appeal, our supreme court addressed "how the collateral source rule applies in cases in which the plaintiff's medical bills are paid by Medicaid and/or Medicare at a discounted rate." *Id*. at 399.

¶ 188    Our supreme court confirmed that Illinois applies the "reasonable-value approach" to the collateral source rule, meaning a plaintiff may seek to recover the full amounts originally billed by medical providers. *Id*. at 411-414. In doing so, it rejected defendant's argument that "*Arthur* followed a benefit-of-the bargain theory and that the rule allowing privately insured plaintiffs to seek recovery of write-offs would not apply to a plaintiff covered by Medicaid or Medicare." *Id*. at 411-12. *Willis* reasoned that one of the justifications for the collateral source rule is to prevent a tortfeasor from "tak[ing] advantage of contracts *or other relations* that may exist between the injured party and third persons." (Emphasis in original.) *Id*. at 413 (quoting *Arthur*, 216 Ill. 2d at 79). "Clearly, another relationship between an injured plaintiff and a third party could be a relationship with the government that allows the plaintiff's medical expenses to be paid because of facts such as her age or income level." *Id*. In holding that the trial court erred in limiting the

medical expense award to the amounts paid by Medicaid and Medicare, the supreme court rejected defendant's position "that the write-off amount was not recoverable as damages as a matter of law." *Id*. at 419-20.

¶ 189    *Willis* thus indicates that, under common law interpretation of the collateral source rule, a plaintiff may recover the full amount of medical expenses billed by medical providers, even where the bills are paid at a discounted rate by Medicare.

¶ 190    In this appeal, defendants do not rely on the common law to suggest that plaintiff's award should be reduced to account for Medicare's downward adjustments in Sylvia's medical bills. Rather, they rely on section 2-1205 of the Code of Civil Procedure, which is a legislative modification of the collateral source rule. See *Willis*, 229 Ill. 2d at 400 (noting that "The legislature has modified the collateral source rule in section 2-1205 and 2-1205.1 of the Code of Civil Procedure," which were not at issue in *Willis*.) Nonetheless, we do not find that section 2-1205 permits the reduction that defendants seek.

¶ 191    Section 2-1205 states:

> "Reduction in amount of recovery. An amount equal to ***
>
> (ii) 100% of the benefits provided for medical charges, hospital charges, or nursing or caretaking charges, which have been paid, or which have become payable to the injured person by any other person, corporation, insurance company, or fund in relation to a particular injury, shall be deducted from any judgment in an action to recover for that injury based on an allegation of negligence or other wrongful act, not including intentional torts, on the part of a licensed hospital or physician; provided, however, that:

> (1) Application is made within 30 days to reduce the judgment;
>
> (2) Such reduction shall not apply to the extent that there is a right of recoupment through subrogation, trust agreement, lien, or otherwise;
>
> (3) The reduction shall not reduce the judgment by more than 50% of the total amount of the judgment entered on the verdict;
>
> (4) The damages awarded shall be increased by the amount of any insurance premiums or the direct costs paid by the plaintiff for such benefits in the 2 years prior to plaintiff's injury or death or to be paid by the plaintiff in the future for such benefits; and
>
> (5) There shall be no reduction for charges paid for medical expenses which were directly attributable to the adjudged negligent acts or omissions of the defendants found liable."

735 ILCS 5/2-1205 (West 2022).

¶ 192   In arguing that this statute is inapplicable, plaintiff emphasizes that it permits reduction of "100% of the benefits provided for medical charges *** *which have been paid, or which have become payable to the injured person* by any other person, corporation, insurance company or fund ***." (Emphases added.) *Id*. Plaintiff asserts that amounts "written off" from medical bills for Sylvia's care do not fall within the scope of the statute, as they are not amounts actually paid or payable to the injured person.

¶ 193   In *Miller*, 2016 IL App (4th) 150728, the Fourth District addressed a similar question and found the plain language of the statute did not apply. In that medical malpractice case, the jury returned a plaintiff's verdict including an award of $133,347.91 for medical expenses. *Id*. ¶ 3.  In

the circuit court, defendants moved to reduce the verdict under section 2-1205; the trial court granted the motion and court reduced the verdict by $91,724.03. *Id.* ¶ 5.

¶ 194    On appeal, plaintiff challenged the reduction on the grounds that the amount of the reduction "was not paid by anyone. Instead, the medical care providers 'wrote off' this amount from plaintiff's bills."  *Id.* ¶ 8. Thus, the Fourth District considered "whether the legislature intended section 2-1205 to allow verdicts to be reduced by the amount of medical bills written off by health care providers." *Id.* In other words, "because the jury awarded plaintiff medical expenses in the amount billed by his medical providers, should defendant be able to reduce the judgment by the amount written off by the medical providers, which was never paid by anyone?" *Id.* ¶ 14. The Fourth District concluded that under the plain language, the answer was no.

¶ 195    The Fourth District reasoned that a reduction under the statute pertained to amounts that were either paid or payable to the injured person, whereas a write-off by a medical provider is "not payable to anyone, least of all to the injured person." *Id.* ¶ 16 (quoting from *amicus* brief of Illinois Trial Lawyers Association). The court explained: "The plain language of section 2-1205 shows it was only intended to apply if the benefits were paid to the medical provider or had become payable to the plaintiff—and then only if other limitations do not apply. [Citation.] The amount the medical providers wrote off from their original bills was never paid by anyone, and the amount certainly had not become payable to the plaintiff." *Id.* ¶ 17.

¶ 196    The Fourth District in *Miller* concluded: "The statute does not allow a verdict to be reduced by the amount of the bills which have been satisfied or the value of the benefit to the plaintiff. Instead, it only allows a verdict to be reduced by the amount paid to the medical providers or payable to the plaintiff." *Id.* ¶16. Thus, it determined that the trial court erred in reducing the judgment by the amounts written off.

¶ 197   We find the reasoning in *Miller* is sound and applicable here. The plain language of section 2-1205 makes clear that it permits reduction only for amounts "which have been paid, or which have become payable to the injured person" by another person or entity. 735 ILCS 5/2-1205 (West 2022).

¶ 198   We are unpersuaded by defendants' reliance on a Second District opinion, *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, which was expressly distinguished in *Miller*. In *Perkey*, the jury awarded $310,000 in medical expenses, after which defendants sought reduction pursuant to section 2-1205 because the expenses were paid by plaintiff's insurer. 2013 IL App (2d) 120470, ¶ 80. In response, plaintiff argued that the statute did not apply because the insurer, Blue Cross Blue Shield of Illinois (BCBS), had a right of recoupment. *Id*. ¶ 81. Plaintiff submitted a letter from BCBS indicating that it had paid $134,933.95, but that BCBS had the right to be reimbursed from any award plaintiff received under the terms of plaintiff's policy. *Id*. Defendants then amended their request to seek a reduction of the judgment by $175,066.15, *i.e.,* the difference between the medical damages award ($310,000) and the $134,933.05 for which BCBS could seek reimbursement. *Id*. ¶ 82. Plaintiff argued that the existence of a "right of recoupment" barred reduction under section 2-1205. The trial court agreed and denied the request to reduce the judgment, concluding that the statute barred *any* reduction where there was a right of reimbursement. *Id*. ¶ 110.

¶ 199   On appeal, the defendants in *Perkey* argued that the trial court erred in barring any reduction, because the plain language of section 2-1205 was that "[s]uch reduction shall not apply *to the extent* that there is a right of recoupment." (Emphasis in original.) *Id*. (quoting 735 ILCS 5/2-1205(2) (West 2010)). The Second District agreed with defendants, reasoning: "given that the statute says that the reduction shall not apply 'to the extent that' there is a right of recoupment, we

agree that this language limits the reduction by only the extent of, or amount of, the right to recoupment." *Id*. ¶ 112 (noting that plaintiff's interpretation would render the phrase "to the extent that" superfluous.) After holding that the statute prohibits reduction to the extent that the insurer has a right of recoupment, the Second District calculated that the proper reduction was the difference between the medical damages awarded and the amount that BCBS had paid, "so the reduction is limited to $175,066.15 (*i.e.,* $310,000-$134,933.85)." *Id*. ¶ 120. Notably, in *Perkey* there was no explicit discussion as to whether it was proper for the reduction to include amounts billed by medical providers but "written off" and never actually paid.

¶ 200   In this case, defendants suggest we follow the approach in *Perkey* so they should receive a reduction of the total medical damages award (including amounts billed but "written off" and not paid), subject to the right of recoupment. That is, they suggest the amount of reduction under section 2-1205 may include amounts that were initially billed, even if those amounts were adjusted downward and not paid to anyone.

¶ 201   We disagree, as defendants' position ignores the plain language of the statute limiting reduction to amounts "*which have been paid, or which have become payable* to the injured person." (Emphasis added.) 735 ILCS 5/2-1205 (West 2022). Defendants rely on *Perkey* to argue that unpaid "write-offs" are subject to reduction under section 2-1205, but *Perkey* simply did not discuss that precise question. The Fourth District recognized this in *Miller*: "The Second District [in *Perkey*] did not analyze whether bills written off by medical providers qualify as benefits paid to medical providers or payable to the plaintiff. The Second District dealt only with whether the right to recoupment prevented a reduction in the judgment." *Miller,* 2016 IL App (4th) 150728, ¶ 21. Similarly, we do not find *Perkey* persuasive with respect to the particular question at issue.

¶ 202   We recognize that our conclusion appears to result in a windfall for plaintiff, to the extent that she received a sizable medical expenses award, despite the fact that the bulk of the amounts billed were apparently "written down" by Medicare and not paid by anyone. Nevertheless, *Willis* made clear that under the collateral source rule, a plaintiff may seek recovery for the full billed amounts, regardless of whether the bills were paid by Medicare at a discounted rate. The primary rationale is that the tortfeasor should not benefit from plaintiff's relationship with a third party, whether that is the government or a private insurer. See *Willis*, 229 Ill. 2d at 413.

¶ 203   Although section 2-1205 modifies the collateral source rule to permit reduction of an award for certain amounts that have been paid or have become payable to the injured person, it simply contains no language authorizing a reduction for amounts billed by medical providers but written off under an arrangement between the providers and insurers, including Medicare. Whether the statute should be modified to address this is something for the legislature, not the courts, to determine. We must interpret the statute as written. *In re Liquidation of Legion Indemnity Co.*, 2023 IL App (1st) 211379, ¶ 24 ("When the language of a statute is clear and unambiguous, we must adhere to its plain language and meaning.")

¶ 204   In short, we agree with the Fourth District that the plain language of section 2-1205 "does not allow for a defendant to reduce a judgment by an amount that was neither paid to medical providers nor payable to the plaintiff." *Miller*, 2016 IL App (4th) 150728, ¶ 21. In turn, we reject the defendants' claim that the judgment should have been reduced by the amounts of any "downward adjustment" to the billed amounts, since such amounts were never paid or payable to plaintiff. The trial court did not err in declining such a reduction following the jury verdict.

¶ 205          Challenges to the Constitutionality of the Prejudgment Interest Award

¶ 206 We turn to defendants' arguments attacking the validity of the $56,544.66 award for prejudgment interest. Defendants assert multiple reasons why the authorizing statute (735 ILCS 5/2-1303(c) (hereinafter the "PJI statute") violates the Illinois and United States Constitutions. Defendants acknowledge that such challenges to the PJI statute have been rejected by this court in *Cotton v. Coccaro*, 2023 IL App (1st) 220788 and by the Fourth District in *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, but urges that we independently review the asserted constitutional defects. We have done so but find defendants' challenges unconvincing.

¶ 207 The legislature added subsection (c) to section 2-1303 of the Code in 2021, with an effective date of July 1, 2021. Pub. Act. 102-6, § 5 (eff. July 1, 2021). "Until the 2021 amendment, Illinois did not permit recovery of prejudgment interest in personal injury and wrongful death actions." *Cotton*, 2023 IL App (1st) 220788, ¶ 43.

¶ 208 The PJI statute, in relevant part, provides:

> "In all actions brought to recover damages for personal injury or wrongful death resulting from or occasioned by the conduct of any other person or entity, whether by negligence, willful and wanton misconduct, intentional conduct or strict liability of the other person or entity, the plaintiff shall recover prejudgment interest on all damages *** set forth in the judgment. Prejudgment interest shall begin to accrue on the date the action is filed. *** In entering judgment for the plaintiff in the action, the court shall add to the amount of the judgment interest calculated at the rate of 6% per annum on the amount of the judgment, minus punitive damages,

sanctions, statutory attorney's fees, and statutory costs." 735 ILCS

5/2-1303(c) (West 2022).

It also provides: "For any personal injury or wrongful death occurring before the effective date of this amendatory Act *** the prejudgment interest shall begin to accrue on the later of the date the action is filed or the effective date of this amendatory Act of the 102nd General Assembly." *Id.*

¶ 209   Defendants assert four bases upon which we should find the PJI statute unconstitutional. In doing so, we keep in mind that there is a strong presumption that legislation is constitutional, and "[a] party challenging the constitutionality of a statute bears the heavy burden of clearly establishing a constitutional violation." *Rowe v. Raoul*, 2023 IL 129248, ¶ 20. Whether a statute is constitutional is a question of law subject to *de novo* review. *Id.*

¶ 210   First, defendants assert that the PJI statute infringes on the fundamental right to trial by jury under our state constitution. See Ill. Const. 1970, art. I , § 13 ("The right of trial by jury as heretofore enjoyed shall remain inviolate."). They suggest that it imposes a "condition on the right to a jury trial" and "charg[es] a premium for the right to go to trial."

¶ 211   We disagree, for many of same reasons explained in *Cotton*. Insofar as defendants suggest the PJI statute imposes a condition or price on the right to a jury trial, we note that the PJI statute does not limit its application to jury awards but applies to "all actions brought to recover damages for personal injury or wrongful death." 735 ILCS 5/2-1303(c) (West 2022). That is, if the parties to an action waived the right to a jury, the PJI statute would apply equally to an award of damages after a bench trial.

¶ 212   Further, as discussed in *Cotton*, nothing in the PJI statute undermines the jury's role in assessing negligence or determining the proper amount of compensatory damages. Prejudgment interest  "compensates for the use or withholding of money—not physical injury." *Cotton*, 2023

IL App (1st) 220788, ¶ 48. That is, prejudgment interest "is not a component of tort damages but a statutory additur applicable when legislatively defined conditions are satisfied." *Id*. "The jury decides the fact and awards money damages, but the jury has no role in awarding prejudgment interest. It is a ministerial function for the trial court, no different from awarding costs." *Id*. ¶ 49.

¶ 213   Defendants have not articulated why the PJI statute impinges on the right to trial by jury under the Illinois Constitution. We thus reject that constitutional challenge.

¶ 214   In their second constitutional argument, defendants assert that the PJI statute is impermissible special legislation and a violation of equal protection. They rely on the special legislation clause of the Illinois Constitution, under which "The General Assembly shall pass no special or local law when a general law is or can be made applicable." Ill. Const. 1970, art. IV, §13.  This clause "prohibits the General Assembly from conferring a special benefit or privilege upon one person or group and excluding others that are similarly situated." (Internal quotation marks omitted.)  *Piccoli v. Board of Trustees of Teachers' Retirement System*, 2019 IL 122905, ¶ 18. The clause "prevents the legislature from making classifications that arbitrarily discriminate in favor of a select group." *Id*.

¶ 215   A two-part test applies in assessing whether a law is impermissible special legislation. *Id*. "First, we must decide whether the statutory classification at issue discriminates in favor of a select group and against a similarly situated group. Second, if the classification does so discriminate, we must determine whether the classification was arbitrary." *Id*.

¶ 216   As to the first part of the test, there is no dispute that the PJI provision discriminates in favor of personal injury and wrongful death plaintiffs, insofar as it confers a particular benefit for them (prejudgment interest) that is not legislated for plaintiffs in other tort cases. See *First Midwest*

*Bank,* 2023 IL App (4th) 220643, ¶ 217 ("there is no question that the statute confers a benefit on *** personal injury and wrongful death plaintiffs that receive a favorable judgment.").

¶ 217    Nevertheless, applying the second part of the test, we cannot say that this classification is arbitrary. "Whether a classification is arbitrary is generally determined under the same standards that are applicable to an equal protection challenge." *Piccoli*, 2019 IL 122905, ¶ 20. Where a statute does not affect fundamental rights, we apply the "rational basis test to assess its constitutionality," meaning "we ask whether the statutory classification is rationally related to a legitimate state interest." *Id*. This is a low threshold: "If there is any conceivable basis for finding a rational relationship, the law will be upheld." *Id*.

¶ 218    The prejudgment interest statute easily satisfies the rational basis test. It is apparent that the statute is rationally related to at least one legitimate interest: reducing the large amount of protracted and costly wrongful death and personal injury litigation in our state courts. By conferring the additional benefit of prejudgment interest to successful plaintiffs, the legislation encourages defendants to seek earlier resolution of cases through settlements. Indeed, the statute includes language that will reduce the prejudgment interest owed, where defendants offered settlement.[6]

¶ 219    Defendants maintain that despite "its ostensible purposes of encouraging earlier settlement" and reducing delay, it is still improper for the legislature to "distinguish personal

---

[6]   The statute provides: "If the judgment is greater than the amount of the highest written settlement offer made by the defendant *** and not accepted by the plaintiff within 90 days after the date of the offer or rejected by the plaintiff, interest added to the amount of judgment shall be an amount equal to interest calculated at the rate of 6% per annum on the difference between the amount of the judgment ***, and the amount of the highest written settlement offer. If the judgment is equal to or less than the amount of the highest written settlement offer made by the defendant *** not accepted by the plaintiff within 90 days after the date of the offer or rejected by the plaintiff, no prejudgment interest shall be added to the amount of the judgment." 735 ILCS 5/2-1303(c) (West 2022).

injury/wrongful death plaintiffs and defendants from all other tort plaintiffs and defendants." We disagree. Certainly, the legislature could conclude that personal injury and wrongful death cases make up a disproportionately large portion of court dockets, warranting legislation encouraging quicker resolution of those cases. In addition, as noted by the Fourth District, the legislature could also conclude that personal injury and wrongful death plaintiffs should be entitled to prejudgment interest, because they "suffer unique challenges" and "their bodily integrity has been violated by the wrongful conduct in a way that victims of property or reputational torts do not suffer." *First Midwest Bank*, 2023 IL App (4th) 220643, ¶ 218. Either of these rationales is a non-arbitrary basis for the legislature to distinguish personal injury and wrongful death claimants from other litigants. Accordingly, we reject defendants' challenge to the PJI statute as impermissible special legislation.

¶ 220   Defendants additionally claim that the PJI statute is unconstitutional because it violates the separation of powers. See Ill. Const. 1970, Art. II, § 1 ("The legislative, executive,  and judicial branches are separate. No branch shall exercise powers properly belonging to another."). Defendants argue the PJI statute "intrudes on judicial discretion by declaring prejudgment interest applicable to all compensatory damages," regardless of which party is responsible for a delay in trial. They claim it "reduces the trial court to a bookkeeper, mechanically adding interest" for a legislative purpose that may have no relation to the specific case.

¶ 221   Defendants suggest we should be guided by *Best v. Taylor Machine Works,* 170 Ill. 2d 367, (1997) in which our supreme court struck down a statute imposing a $500,000 cap on compensatory damages for noneconomic injuries in negligence actions. Our supreme court reasoned that the legislative cap on damages violated the separation of powers, insofar as it undercut the judiciary's "traditional and inherent power *** to apply the doctrine of remitittur *** to correct excessive jury verdicts." *Id*. at 411-14. Our supreme court also held that the cap on

damages was a "legislative remittitur" that "disregarded the jury's careful deliberative process in determining damages that will fairly compensate injured plaintiffs." *Id*. at 414.

¶ 222   Defendants urges that the PJI statute is an impermissible "legislative additur" that is invalid under the same reasoning expressed in *Best*. We disagree, as *Best* is easily distinguishable. The legislation at issue in *Best* purported to cap *compensatory damages*, undermining the jury's role in assessing damages, as well as the trial court's traditional authority to enter a remittitur to guard against excessive verdicts. Those concerns are simply not at issue with the PJI statute, as the calculation of prejudgment interest is separate from the factfinder's determination as to the amount of damages that will compensate plaintiffs for their personal injuries. See *Cotton*, 2023 IL App (1st) 220788, ¶ 48 ("Prejudgment interest *** is not a component of tort damages but a statutory additur" that "compensates for the use or withholding of money—not physical injury."). The PJI statute does not infringe on the functions of a judge or jury any more than other routine "ministerial" calculations, such as imposition of postjudgment interest or an award of costs. See *id*. ¶ 49.

¶ 223   As defendants do not articulate any way in which the PJI statute undermines the authority of the judicial branch, we reject its separation of powers argument.

¶ 224   In defendants' final attack on application of the PJI statute, they suggest it cannot constitutionally apply to an action that accrued before its July 2021 effective date. They urge it "improperly applies to any personal injury or wrongful death occurring before" the effective date, "removing a defense that had previously existed and vested once the action accrued."

¶ 225   Defendants rely on the principle that legislation cannot be applied retroactively to destroy a "vested" right or defense. See *Lazenby v. Mark's Construction, Inc*., 236 Ill. 2d 83, 94 (2010) (stating that a "vested ground of defense is as fully protected from being cut off or destroyed by

an act of the legislature as is a vested cause of action." (quoting *Heinrich v. Libertyville High School*, 186 Ill. 2d 381, 404-05 (1998)).

¶ 226   Defendants suggest this case is analogous to *Heinrich*, in which our supreme court refused to permit retroactive application of an amendment to a Tort Immunity Act that eliminated an immunity defense nearly four years after the plaintiff cause of action accrued. *Heinrich,* 186 Ill. 2d at 404 (holding the defendant school district had a "vested right" to the immunity provided by the statute before the amendment). Here, defendants suggest they had a "vested right to assert a defense that prejudgment interest had been unavailable in cases of this sort," and that the legislature could not destroy that right after the instant action accrued.

¶ 227   We find defendants' argument unpersuasive, for the same reasons our court discussed in rejecting a similar challenge in *Cotton,* 2023 IL App (1st) 220788. First, we are not convinced that the PJI statute is, in fact, retroactive. It specifies that "prejudgment interest shall begin to accrue on the later of the date the action is filed or the effective date" of the legislation. 735 ILCS 5/2-1303 (West 2022). "The amendment does not apply to judgments entered prior to its effective date, so it is not retroactive in its application." *Cotton*, 2023 IL App (1st) 220788, ¶ 69.

¶ 228   Moreover, even assuming *arguendo* that the PJI statute could be deemed retroactive, we are not convinced that it took away any "vested right" of defendants to avoid prejudgment interest in wrongful death and personal injury cases. This situation is clearly distinguishable from that in *Heinrich*, where an amendment removed a specific statutory defense to immunity. Here, no prior statute provided a defense to prejudgment interest in these types of cases. Rather, defendants suggest that because plaintiffs had no prior recognized right to seek prejudgment interest, this means defendants had a "vested right" to avoid having to pay such interest, which was "akin to a property right." We disagree. The mere fact that the legislature made prejudgment interest

recoverable in wrongful death and personal injury cases does not mean it unconstitutionally destroyed a pre-existing common law or statutory right. See *Cotton*, 2023 IL App (1st) 220788, ¶ 70 ("The General Assembly may change or abolish remedies without infringing on a constitutional right. [Citations].)

¶ 229   In short, we reject all of defendants' challenges to application of the PJI statute. Thus, we decline to disturb the trial court's award of prejudgment interest.

¶ 230   CONCLUSION

¶ 231   In summary, we find that defendants were not entitled to judgment notwithstanding the verdict. We also reject defendants' claims that trial errors entitled them to a new trial. We also find that defendants were not entitled to a remittitur or reduction of the verdict under section 2-1205 of the Code of Civil Procedure. We also reject defendants' attacks on application of the prejudgment interest statute. We thus affirm the judgment on the jury verdict in plaintiff's favor.

¶ 232   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 233   Affirmed.